DYER, J.
 

 This is an action concerning the emancipation of Thomas C., a minor whose date of birth is May 29, 1979. The petitioners are Jeffrey and Maureen C., his parents. The action was brought pursuant to General Statutes § 46b-150, as amended by Public Acts 1995,
 
 *440
 
 No. 95-225, § 28, to the Superior Court for Juvenile Matters at Plainville. It was subsequently transferred to this venue for trial.
 

 The petitioners and Thomas were each represented by counsel. The court also appointed a separate guardian ad litem for Thomas. On February 8,1996, the court, on its own motion and pursuant to the provisions of General Statutes § 46b-150a, ordered that the court services officer from the Superior Court for Juvenile Matters at Plainville investigate the allegations in the petition and file a report thereon with the court.
 

 A contested hearing on the petition was held before this court on May 22,1996. The petitioners were present, but Thomas, despite notice and a request by his guardian ad litem, did not attend. At trial, each petitioner testified. Martha Boyer, court services officer at the Superior Court for Juvenile Matters at Plainville, testified and the report of her investigation into this matter was introduced into evidence. The guardian ad litem called three witnesses: Paula Greenfield, a special education teacher and department head at the E.C. Goodwin Technical School (Goodwin) in New Britain; Robert Ledder, school psychologist at Goodwin; and, Timothy D., the maternal uncle of Thomas.
 

 The court, having carefully considered the relevant testimony and evidence introduced at trial, makes the following factual findings. Thomas is sixteen years of age and will turn seventeen on May 29, 1996. He is the eldest of four boys bom to Jeffrey and Maureen C. Thomas resides in the family home with his parents and three brothers. He dropped out of Goodwin one week prior to his sixteenth birthday, but had disciplinary problems there for approximately one year prior to quitting school. He has not participated in any educational program since then, and refuses to do so. He is
 
 *441
 
 unemployed and refuses to look for work. He is dependent on his parents for food and shelter.
 

 Thomas suffers from a learning disability known as attention deficit disorder. He was “mainstreamed” into regular classes at Goodwin, but received supportive services for his learning disability from the school’s resource room and psychologist. Thomas is very intelligent, but displayed veiy little motivation academically. He had difficulty attending to his academic tasks, and appeared frustrated at times. There was some academic improvement when Thomas was prescribed Ritalin for his learning disability. This was short-lived however, and Greenfield articulated the suspicion that Thomas “didn’t always take” the medicine. According to Greenfield, Thomas had problems with self-esteem, and gravitated toward other students with social and emotional problems. Although he could interact appropriately with teachers and peers “when he wanted to,” he was, on other occasions, “troubled and difficult.” He began to display an escalating pattern of rules violations, particularly infractions related to being in unassigned areas of the school. These disciplinary problems resulted in a number of suspensions. Thomas was resistant to the rules and structure that Goodwin attempted to impose, and angrily blamed teachers and staff there for the problems he was experiencing. The school recommended counseling, a suggestion which was accepted by the parents but rejected by Thomas.
 

 Thomas’ behavior at home has been even more problematic. He is frequently verbally abusive to his parents, calling them obscene names. He has been physically and verbally abusive to his younger brothers, particularly his twelve year old brother, whom Thomas cruelly taunts about his weight and physical appearance. Thomas was arrested and charged with breach of the peace as the result of a domestic dispute with his father.
 
 *442
 
 This charge was later nolled. Thomas’ antagonistic attitude toward his parents and brothers results in great tension within the home. Family members “walk on egg shells” to avoid confrontations with Thomas.
 

 Thomas resided away from the family home for approximately six months during 1995. Around June of that year, he began living in the home of his maternal uncle and maternal grandmother. His behavior there was good. According to the uncle, Timothy D., Thomas obeyed household rules and did not display violent or aggressive behavior. He remained with his uncle and grandmother throughout the summer. One day, shortly after the start of the academic year in September, Thomas went to school one morning but did not return to his relatives’ home that afternoon. The uncle subsequently discovered that Thomas had begun living with someone in New Britain. The uncle was unclear as to the cause of Thomas’ departure, and said that his nephew was welcome to stay with the grandmother and him. Thomas remained in the New Britain residence until around November, 1995, when he returned to live with his parents. He has lived with his parents and siblings in the family home since then.
 

 During trial, the father, Jeffrey C., testified that he did not intend to seek Thomas’ immediate removal from the home if the court granted the emancipation petition. He said that he intends to use the decree as a “lever,” hoping that the legal ability to deny Thomas shelter and support would compel him to become more respectful and compliant at home. The father stated that he was “looking to hold [an emancipation order] over his head. ”
 

 Boyer, the court services officer, indicated in her report to the court that the parents expressed concern about their vicarious financial liability for civil or criminal wrongdoing by Thomas, and their feeling that they do not have any control over their son’s behavior. She
 
 *443
 
 also indicated that Thomas and his parents “stated that they would like to improve communication and develop closer relationships with one another.” Boyer adds: “However, it appears that both Thomas and his parents do not know how to resolve the current difficulties they are having.” Boyer did not offer a recommendation as to whether the court should grant emancipation. She did express the opinion that the “family could benefit from family therapy to address communication and conflict resolution, if all parties agreed to attend.”
 

 The applicable law in the present case is General Statutes § 46b-150b, as amended by Public Acts 1995, No. 95-225, § 28. This statute specifies four separate grounds for granting a decree of emancipation. The petitioners have stipulated that only the fourth ground, as delineated in subdivision (4) of the statute, applies in the present case. Section 46b-150b (4) provides that the court may grant an order emancipating a minor if the court finds that “for good cause shown, it is in the best interest of the minor, any child of the minor or the parents or guardian of the minor . . . .” Neither the statute, nor Connecticut case law, offer guidance as to the meaning of the term “good cause” as it is used in the emancipation law. Ballentine’s Law Dictionary (3d Ed. 1969) defines the term as meaning, inter alia, a “substantial reason” or “legal excuse.” General Statutes § 46b-150d sets forth the effects of an emancipation order and provides in relevant part that: “(a) The minor may consent to medical, dental or psychiatric care, without parental consent, knowledge or liability; (b) the minor may enter into a binding contract; (c) the minor may sue and be sued in his own name; (d) the minor shall be entitled to his own earnings and shall be free of control by his parents or guardian; (e) the minor may establish his own residence; (f) the minor may buy and sell real and personal property; (g) the minor may not thereafter be the subject of a petition
 
 *444
 
 under section 46b-120 as an abused, dependent, neglected or uncared for child or youth; (h) the minor may enroll in any school or college, without parental consent; (i) the minor shall be deemed to be over eighteen years of age for purposes of securing an operator’s license under section 14-36 and a marriage license under subsection (b) of section 46b-30 without parental consent; Q) the minor shall be deemed to be over eighteen years of age for purposes of registering a motor vehicle under section 14-12; (k) the parents of the minor shall no longer be guardians of the minor under section 45a-606; (l) the parents of a minor shall be relieved of any obligations respecting his school attendance under section 10-184; (m) the parents shall be relieved of all obligation to support the minor; (n) the minor shall be emancipated for the purposes of parental liability for his acts under section 52-572; (o) the minor may execute releases in his own name under section 14-118; and (p) the minor may enlist in the armed forces of the United States without parental consent.”
 

 This is an unfortunate and problematic case. Thomas’ defiance of parental, school and legal authority causes great problems, both for himself, and for his family. The court is empathetic with the plight of his parents and siblings, who must endure the fallout of his unmotivated lifestyle and abusive behavior. The present case is another example of the inability of parents, schools, courts and social service agencies to deal effectively with the so-called “gray area” cases. Such cases involve sixteen and seventeen year old minors, who cannot be legally compelled to attend school or to obey the household rules, but whose parents are legally obligated to support and to shelter them. The parents believe that a decree of emancipation would somehow serve as a legal wake-up call to Thomas — with the threat of removal from the home and withdrawal of parental
 
 *445
 
 support transforming him into an obedient and motivated young man. While the court wishes that it could prompt such a response, the legal remedy requested by the petitioners is not likely to do so, and the court, in the exercise of its discretion, finds that it is not appropriate to grant emancipation, based on the facts of the present case.
 

 The evidence and testimony adduced at trial prove that emancipation would be extremely detrimental to the best interests of Thomas. He lives with his parents, is totally dependent on them for food, shelter and necessities, and lacks the educational, emotional and financial wherewithal and stability to live independently. This fact is tacitly acknowledged by the father, who testified that he intended to support and to shelter Thomas, if possible, after an emancipation decree entered. It is also clear that there is no real plan for Thomas should he ultimately be required to vacate the parental home and to fend for himself. Setting this learning disabled and obviously immature youth totally adrift without some realistic planning for his future needs would be courting a head-on collision with disaster. The court also notes parenthetically that it is highly unlikely that a decree freeing Thomas from parental controls will somehow make him more responsive to his parents’ guidance or direction. It would also be improvident to confer unsupervised adult rights like the ability to contract, to register a motor vehicle, to sign releases, to buy and sell property and to obtain a driver’s license on an impulsive teenager who has frequently displayed a proclivity for inappropriate behavior.
 

 The rights of parents to raise and to nurture then-children are among the most fundamental and basic of human rights. “It is cardinal with us that the custody, care and nurture of the child reside first in the parents,
 
 *446
 
 whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” (Internal quotation marks omitted.)
 
 Stanley
 
 v.
 
 Illinois,
 
 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). From that premise flows the corollary that parental obligations and responsibilities cannot be lightly shed or abrogated by a child’s parent or guardian. See
 
 Mills
 
 v.
 
 Theriault,
 
 40 Conn. Sup. 349, 353, 499 A.2d 89 (1985);
 
 In re Bruce R.,
 
 34 Conn. App. 176, 184-85, 640 A.2d 643, cert. granted, 230 Conn. 902, 644 A.2d 915 (1994). Although unfortunate, it is one of the realities of life that parents must shoulder burdensome responsibilities for children who misbehave, or become physically or emotionally ill. A decree legally excusing parents from the obligations and duties of parenthood should not be granted without a substantial reason. Although the petitioners’ stated reasons for seeking emancipation are understandable, the court finds that they do not meet the burden of a good cause showing that it would be in the best interest of the child, or his parents, to emancipate Thomas.
 

 For all of the aforementioned reasons, the petition for emancipation is hereby denied.